UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

00 MAY 10 PM 4:36

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| LARRY WOODS,                             ) | |
|                                          ) | |
|      **Plaintiff,**                      ) | |
|                                          ) | |
| **vs.**                                  ) | Civil Action No. CV-99-S-187-NE |
|                                          ) | |
| CITY OF DECATUR, ALABAMA, a              ) | |
| municipal corporation;                   ) | **ENTERED** |
| WILLIAM LEWIS, individually              ) | |
| and in his official capacity             ) | MAY 10 2000 |
| as Fire Chief of the City of             ) | |
| Decatur; and JULIAN PRICE,               ) | |
| individually and in his                  ) | |
| official capacity as Mayor of )          | |
| the City of Decatur,                     ) | |
|                                          ) | |
|      **Defendants.**                     ) | |

### MEMORANDUM OPINION

This action is before the court on defendants' motion for
summary judgment (Doc. No. 17), defendants' three motions to strike
certain evidence submitted by plaintiff in opposition to summary
judgment (Doc. Nos. 29, 30 & 31), and defendants' motion for leave
to file a reply brief in support of summary judgment (Doc. No. 32).
Upon consideration of pertinent portions of the case file,
defendants' various motions to strike, as well as their motion for
leave to file a reply brief, are due to be denied.  Finally, upon
full consideration of defendants' motion for summary judgment, the
pleadings, briefs, and evidentiary submissions, this court
concludes that motion is due to granted in part and denied in part.



## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (emphasis supplied).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally id*.; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by showing the court there is an absence of evidence to support the non-movant's case. *See Jeffery*

*v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*).  Rule 56 permits the movant to discharge this burden with or without supporting affidavits.  *See Celotex Corporation*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *See Jeffery*, 64 F.3d at 593.  The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor.  *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Inferences in favor of the non-movant are not unqualified, however.  "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment."  *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted).  Moreover, evidence that is merely

colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

Plaintiff, Larry Woods, was hired as a fire fighter by defendant City of Decatur, Alabama, during October of 1974. Twenty-one years later, during December of 1995, the City hired defendant William Lewis as Chief of its Fire Department.  The remaining defendant, Julian Price, was elected Mayor of the City of Decatur in 1994.

On the date William Lewis assumed his duties as Chief of the Fire Department, plaintiff held the rank of lieutenant, assigned to City Fire Station No. 5.  He had been assigned to that station for approximately ten years.

Less than two years after Lewis became Chief of the Fire Department, a number of City fire fighters organized a union.  The organization is known as the "Decatur Firefighters' Association, Local 1437."  Plaintiff served as a union "shop steward" for Station No. 5.[1]  He described himself as an "outspoken union

---

[1] Plaintiff summarized his duties as union shop steward in deposition:

Basically the same duties any station steward has for a union. We help -- if anybody has certain problems with grievances or anything of that nature, we help them get started in the right direction.  Things of that nature.  Just whatever the union, you know, they think the union should have something to do with, we have it checked out through the membership and all that to see if it's something we need to help the people with. ...

Deposition of plaintiff, attached as Exhibit 1 to plaintiff's evidentiary submission in opposition to summary judgment (Doc. No. 24), at 160-61.

member."[2]  For example, when Chief Lewis instituted an Emergency Medical Services program ("EMS"), which required the Fire Department to respond to medical emergencies, plaintiff did not think well of that initiative.  Plaintiff was not shy about voicing his opinion that responding to non-life threatening medical situations endangered both fire fighters and Decatur citizens.

> Q.    Did you have any objections to any EMS runs?
>
> A.    I had objections to mak[ing] emergency runs to nonemergency situations.
>
> Q.    How do you define a nonemergency situation?
>
> A.    When the dispatcher is told that there is no emergency, that they just need help picking somebody up to put them back in the bed.  But dispatch did not tell us that.  We were told to go ahead and make an emergency run.
>
> Q.    What was your objection to doing that?
>
> A.    It jeopardizes the lives of the men on the fire truck as well as the citizens of Decatur.
>
> Q.    Did you voice that objection?
>
> A.    Yes, I did.
>
> Q.    Okay.  On many occasions?
>
> A.    Several occasions, because we continued to do that.
>
> Q.    Who did you voice these objections to?

---

[2] *Id.* at 84.

6

A.   Chief Lewis, my assistant chief, several others, lieutenants.

Q.   How long did you continue to voice those objections?

A.   I'm still voicing them.[3]

The City of Decatur Personnel Department[4] established a "Liaison Committee" for every department within city government in 1996. The stated purpose "was to provide employees with an avenue to voice concerns and share ideas in an effort to maximize employee morale and productivity."[5] Plaintiff and his fellow union members believed the committees had a more sinister purpose, however; according to Lorenzo Jackson, a member of the Fire Department Liaison Committee, an attorney representing the City "informed the members [at the first Committee meeting] that the liaison committee had been formed in response to Fire Department Union activity."[6]

The Fire Department Liaison Committee consisted of one representative from each City fire station. The Committee was

---

[3]  *Id.* at 64-65.

[4]  The Personnel Department consists of four employees, including the Personnel Director, who are employed by the City of Decatur Personnel Board. "The function of the Personnel Department is to provide services to the operating agencies, and assist personnel with employment matters." Affidavit of Ken Smith, attached as Exhibit 11 to defendants' evidentiary submission in support of summary judgment (Doc. No. 20), at ¶ 2.

[5]  Affidavit of Mary Ann Cartee, attached as Exhibit 2 to defendants' evidentiary submission in support of summary judgment, at ¶ 3.

[6]  Affidavit of Lorenzo Jackson, attached as Exhibit 12 to plaintiff's evidentiary submission in opposition to summary judgment, at ¶ 4.

composed of both union and non-union fire fighters.  Chief Lewis attended Liaison Committee meetings when he was invited. Lieutenant Don Mills, the representative for Station No. 1, was elected Liaison Committee Chairperson.

Station No. 5's initial representative on the Liaison Committee was Lieutenant Danny Little, but he resigned his position in September of 1997.  Without authorization from the Liaison Committee, Station No. 5 held an election to select a new Committee representative.  Plaintiff won the election.  Upon learning that Station No. 5 had commenced an election without authorization from the Liaison Committee, Chief Lewis suggested to Mills that the Liaison Committee should declare the election "null and void," and require another to be conducted.

> Q.   But it was your decision to void the election?
>
> A.   No, it was Lieutenant Mills' decision.   I suggested to him that the election should not be valid, that he should void the election.
>
> Q.   What was the basis for you wishing to deem the election invalid?
>
> A.   Well, I just stated no one called for the election that was a part of the committee.
>
> Q.   Didn't you believe it necessary for Station 5 to have an election to replace its member that was resigning?
>
> A.   Yes.

Q.   Was the committee going to do anything other than ask for an election of a new member from Station 5?

A.   I wouldn't think so.

Q.   But you would not accept this election unless there was some formal request by the committee?

A.   Well, that's what I would think should have take[n] place, and that's what I so advised Lieutenant Mills.[7]

And, that is what occurred.  Upon authorization from the Liaison Committee, another election was held.  Plaintiff won again, however, and assumed his role as Liaison Committee member representing Station No. 5 in October of 1997.

At a meeting of the Liaison Committee in December of 1997, one of its members, Sonny Jackson, sought to tape record the meeting. A member of the City Personnel Board who was in attendance, Charlotte Morgan, opposed the use of a tape recorder, as did Chief Lewis, who also was present.  All representatives were asked for their comments, and plaintiff stated that he had no opposition. According to plaintiff, Chief Lewis then remarked, "if it was [plaintiff's] intention to destroy the liaison committee, [he] had done a damn good job of it."[8]  Chief Lewis explained the mental impressions motivating his comment during deposition:

---

[7] Deposition of William Lewis, attached as Exhibit 2 to plaintiff's evidentiary submission in opposition to summary judgment, at 39-40.

[8] Plaintiff's deposition at 83.

Q.   Did you ever tell Larry Woods that he was doing a damn good job at destroying the Liaison Committee by seeking to either have minutes taken or to record the meeting?

A.   No.  My statement was, if your intentions were to destroy this committee you got a damn good start.

...

Q.   What has he [Woods] done, if anything, to support your statement to him in that regard?

A.   I just, and I'm just going from memory of course, I know he came in like a bull in a China shop first day at the committee meeting and started telling how this thing needs to be changed and making changes, just loud and obnoxious, which was his regular routine, and that's where it came from.[9]

Chief Lewis transferred Lieutenant Howell Dean Eddy from Station No. 7 to Station No. 4 in January of 1998.  Chief Lewis informed Assistant Chief Wayne Nicklaus that a replacement was needed for Station No. 7.  Assistant Chief Nicklaus recommended plaintiff for the position, stating his opinion that the transfer would be in the best interests of plaintiff and the Fire Department as a whole.  As to plaintiff's "best interests," Nicklaus explained that:  plaintiff had numerous "personal problems," some of which were health-related; Station No. 5 was one of the busiest fire stations operating in the City, while Station No. 7 was less active; and, the reduced workload would be a benefit to plaintiff,

---

[9] Lewis deposition at 70-71.

the department, and the City.   Nicklaus elaborated during

deposition:

> Q.   Any other problems at all or any other matters
> that you considered in making this recommendation that
> Larry be transferred?
>
> A.   No.   Just the health, his -- I was concerned
> with his health and well-being, and I felt that this
> would give him a rest, because it's much slower and less
> going on.
>
> Q.   Did you feel it would be in the best interest
> of the Department to transfer Larry from Station 5 to
> Station 7?
>
> . . .
>
> A.   Yes, sir.
>
> Q.   Why?
>
> A.   I felt like he could function with less stress,
> under less work conditions, and again, you know, I
> thought that this was affecting his health and well-
> being, also.
>
> . . .
>
> Q.   How was his, Larry's transfer, good for the
> citizens of Decatur?
>
> A.   It took him out of the busyness of Station 5,
> gave him a break, and gave the station itself, the
> company there more leeway.[10]

Chief Lewis accepted Nicklaus' recommendation, and transferred

plaintiff to Station No. 7.   Chief Lewis stated in deposition that

---

[10] Deposition of Wayne Nicklaus, attached as Exhibit 4 to plaintiff's
evidentiary submission in opposition to summary judgment, at 16-18.

"there's probably less than ten [fire fighters] that have not been transferred in the last three and a half years."[11]

Plaintiff admitted in deposition that his transfer from Station No. 5 to Station No. 7 resulted in no loss of pay, rank, or benefits.   Further, he acknowledged the drive from his home to Station No. 7 was virtually the same distance as Station No. 5. Even so, plaintiff told Nicklaus following the transfer that the slow pace of Station No. 7 actually exacerbated his personal problems, because "he had more time to worry about his problems than he did at 5 because he kept busy at 5."[12]   Plaintiff also told Nicklaus that the transfer divested him of his role as union shop steward.[13]

Plaintiff grieved his transfer on January 11, 1998, contending the action was motivated by Chief Lewis' desire to remove plaintiff from the Fire Department's Liaison Committee.   The first step of the City's grievance procedure requires that the protest be presented to the employee's immediate supervisor.[14]   In this case,

---

[11] Lewis deposition at 60.

[12] Nicklaus deposition at 21.

[13] While serving as steward for Station No. 5, however, no union member had ever consulted plaintiff regarding specific problems with departmental management.

[14] A City of Decatur employee who is dissatisfied with a reassignment may contest the decision by speaking with his or her supervisor, speaking with the Mayor pursuant to his Open Door Policy, speaking with the City Personnel Director, addressing the City Personnel Board, or filing a grievance under the

plaintiff's immediate supervisor was Assistant Fire Chief Ted Holland.   Holland had not been involved in the decision-making process leading to plaintiff's transfer, however.   Holland consequently was unable to address plaintiff's concerns, and accordingly discussed the grievance with Chief Lewis.

After conferring with the City Personnel Department and legal counsel, Chief Lewis informed plaintiff by letter that his complaints could not be pursued through the grievance procedure.

> It is inherent in para-military organizations that upper management ha[ve] the flexibility to make duty assignments. Duty assignments are made to improve the department and/or to improve personnel performance and are not reprimands. These decisions should be determined by management with input from the individual's supervisor if deemed appropriate.
>
> Chief Holland asked my advice concerning your complaint about your recent duty assignment. I advised Chief Holland that duty assignments or re-assignments were not a grievable matter, and that it would not be necessary for him (Chief Holland) to address the matter.
>
> As we discussed on two previous occasions, the change in duty assignments has no connection with the Liaison Committee. <u>I will recommend that you be allowed to serve</u>

---

City's Internal Complaint and Review System ("IECRS").   Plaintiff initially pursued the last option.

The City of Decatur Personnel Board created the IECRS, which is "an internal review process that entitles City employees to appeal the application of an official City policy, practice or procedure if the employee alleges that the policy, practice or procedure has been unfairly applied to him or her. ... The Personnel Board for the City created and implemented the IECRS, and the Personnel Department is responsible for the administration and application of the policy." Cartee affidavit ¶ 6.

<u>as a[n] at-large member of the Committee</u>.[15]

The Chief's recommendation that plaintiff be allowed to remain on the Liaison Committee as an "at-large member" was followed.  As reflected in a letter drafted on February 20, 1998, as well as the minutes of the Liaison Committee meeting held on that same date, plaintiff was recognized as an at-large member of the Committee.[16] Moreover, in March of 1998, plaintiff was elected to represent Station No. 7 on the Committee.

After Chief Lewis informed plaintiff that his transfer was not grievable, plaintiff met with the Mayor of the City of Decatur, Julian Price, pursuant to the Mayor's "Open Door Policy."[17]  In fact, plaintiff met with Mayor Price on three occasions — February 2, March 6, and April 16, 1998.  During the February 2nd meeting, plaintiff asked Mayor Price to address Chief Lewis' opinion that plaintiff's transfer was not a grievable issue.  Mayor Price conferred with Chief Lewis and the City's attorney, and concluded that the decision to transfer plaintiff was within the Chief's

---

[15] Letter from Chief Lewis to plaintiff, attached as Exhibit 6 to plaintiff's deposition (emphasis supplied).

[16] *See* Exhibits 5 and 8 to plaintiff's deposition.  Plaintiff did not attend the Liaison Committee meeting on February 20th, however, because he had a "previous engagement."  Plaintiff's deposition at 95.  Plaintiff admitted he could have made that meeting "if [he] hadn't had something previously scheduled." *Id*.

[17] The Mayor maintains such a policy for all City employees, for the purpose of entertaining complaints by such individuals.

14

discretion, and therefore was not a grievable issue.  At the March 6th meeting, plaintiff asked the Mayor to confirm that the transfer would not affect his membership on the Liaison Committee.  Just like Chief Lewis, Mayor Price assured plaintiff that he would retain his membership on the Committee, despite the transfer.  At the April 16th meeting, plaintiff asked Mayor Price to request that the City Personnel Board allow plaintiff an opportunity to address that body regarding his concerns over the transfer.  The Mayor made such a request.

The City Personnel Board, which "serves as the final authority with respect to ... [contested] employment action[s]," met with plaintiff on May 28, 1998.  "On June 25, 1998, the Personnel Board held a meeting at which time it determined that Mr. Woods' concerns regarding his transfer from Station 5 to Station 7 were not grievable, and that Chief Lewis' decision to transfer Mr. Woods was both proper and within the scope of his authority."[18]

Plaintiff ultimately resigned his position with the City of Decatur Fire Department on September 24, 1998.  He commenced this action on January 27, 1999.

---

[18] Smith affidavit ¶ 10.

15

## III. DISCUSSION

Plaintiff contends defendants violated 42 U.S.C. § 1983,[19] Alabama Code § 11-43-143,[20] and unlawfully conspired to violate both statutes when transferring him from Station No. 5 to Station No. 7. Plaintiff does not specify whether his conspiracy claim arises under federal or state law, however.

Plaintiff supports his allegations with affidavits by City of Decatur fire fighters.  Russell Johnson claimed Chief Lewis told him that neither he nor the City of Decatur would accept proposals

---

[19] 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. ...

[20] Alabama Code § 11-43-143 provides, in relevant part, that:

> All fire fighters serving the state or any municipality in the state either as paid firemen or as volunteer fire fighters who comply with the provisions of this section are assured the right and freedom of association, self-organization and the right to join or to continue as members of any employee or labor organization which complies with this section, and shall have the right to present proposals relative to salaries and other conditions of employment by representatives of their own choosing.  No such person shall be discharged or discriminated against because of his exercise of such right, nor shall any person or group of persons, directly or indirectly, by intimidation or coercion compel or attempt to compel any fire fighter or fireman to join or refrain from joining a labor organization.

16

from Local 1437 regarding the Fire Department's promotional procedure.[21]   Mike Smith, who acted as plaintiff's representative in attempting to file a grievance relating to the transfer, says that he "witnessed and ha[s] been subject to harassment toward the local union and its members from Chief Lewis, Mayor Price and the personnel board."[22]   Smith further stated that the former Mayor of the City of Decatur, Bill Dukes, mailed plaintiff a letter after he filed his grievance, which indicated "that the formation of a union would be looked down upon by the City of Decatur."[23]

## A.   42 U.S.C. § 1983 Claims

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) (citations and internal quotation marks omitted).   Plaintiff premises his § 1983 claims on defendants' alleged violations of the First and Fourteenth Amendments to the United States Constitution.[24]   Specifically, he

---

[21] Affidavit of Russell Johnson, attached as Exhibit 10 to plaintiff's evidentiary submission in opposition to summary judgment, at ¶ 25.

[22] Affidavit of Mike Smith, attached as Exhibit 11 to plaintiff's evidentiary submission in opposition to summary judgment, at ¶ 13.

[23] *Id.* ¶ 16.

[24] The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of

17

claims defendants abridged the First Amendment "by restricting [his] right and freedom of association; by targeting him for transfer due to his association with and participation in the local Firefighters' Association; and due to his speech and activity in support of the local Firefighters' Association."[25]   Plaintiff's Fourteenth Amendment claims are bottomed on defendants' alleged denial of procedural due process, substantive due process, and equal protection relating to the transfer.[26]   In sum, plaintiff asserts that his transfer, and the City's failure to permit him to complaint about the transfer through the grievance procedure, was motivated by plaintiff's affiliation with Local 1437, his participation on the Liaison Committee, and his vocal opposition to policies of Chief Lewis.

> In order for a public employee to establish that an
> employer conditioned his or her job in a way that
> burdened impermissibly a constitutional right, the

---

grievances." U.S. Const. amend. I.  The Fourteenth Amendment provides, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

[25] Complaint (Doc. No. 1), at ¶ 29.

[26] "Larry Woods avers that the Defendants, individually, professionally and/or collectively, violated the Fourteenth Amendment of the United States Constitution by denying him procedural due process, substantive due process, and by denying him the equal protection of the State and Federal law." Complaint ¶ 34.  Defendants correctly point out in brief that any equal protection claim premised on Alabama law is due to be dismissed, because "Alabama does not provide an equal protection guarantee." Defendants' memorandum of law in support of summary judgment (Doc. No. 21), at 16 (citing Ex parte Melof, 735 So. 2d 1172, 1186 (Ala. 1999)).

18

> employee must first demonstrate that the asserted right
> is protected by the Constitution and that he or she
> suffered "adverse employment action" for exercising the
> right. ... Upon making these two showings, the employee
> is entitled to prevail if the adverse employment action
> was taken in such a way as to infringe the
> constitutionally protected right.

*McCabe v. Sharrett*, 12 F.3d 1558, 1562 (11th Cir. 1994) (citations

omitted).

In *McCabe*, the plaintiff sued a police chief and municipality

under § 1983, alleging they had violated her First Amendment right

to freedom of association by transferring her after she married a

police officer who worked for the municipality.   Before her

marriage, plaintiff was the police chief's personal secretary.

Following her marriage, plaintiff was reassigned to a Clerk Typist

position in the municipality's Parks and Recreation Department.

*See id*. at 1559-60.  The Eleventh Circuit treated such transfer as

an "adverse" employment action, because plaintiff's salary was

frozen, she was ineligible for a raise for nearly five years, and

the Clerk Typist position involved less responsibility and more

menial tasks than her previous position.   *See id*. at 1560.

According to the *McCabe* court, "'[a]dverse employment action' is

broadly defined and as a matter of law includes not only

discharges, but also demotions, refusals to hire, refusals to

promote, and reprimands." *Id.* at 1563.  *Cf. Doe v. DeKalb County School District*, 145 F.3d 1441, 1450-52 (11th Cir. 1998) (adopting an objective standard for determining whether plaintiff suffered an adverse employment action in a disability discrimination case, which requires a showing "that a reasonable person in [plaintiff's] position would have found his transfer to be adverse under all the facts and circumstances"); *Smith v. Alabama Department of Public Safety*, 64 F. Supp. 2d 1215, 1221-22 (M.D. Ala. 1999) (finding that Title VII plaintiff could not establish adverse employment action, because he suffered no loss in pay, benefits, or classification, only great embarrassment).

This court assumes *arguendo* that plaintiff's vocal opposition to the Fire Chief's policy initiatives, as well as his affilation with Local 1437, are constitutionally protected forms of expression and association under the First Amendment.  Even so, the facts of this case do not demonstrate that plaintiff suffered an "adverse" employment action.  The transfer entailed no loss in pay, benefits, or rank.  Plaintiff was not forced to commute a greater distance to and from work.  *Accord Smith v. Upson County*, 859 F. Supp. 1504, 1510 (M.D. Ga. 1994) (failing to recognize adverse employment action in § 1983 case premised on defendants' alleged violations of

plaintiff's First Amendment right to free speech and Fourteenth Amendment right to procedural due process, where plaintiff's transfer resulted in no loss in pay, benefits, or classification, only denial of use of a county car), *aff'd*, 56 F.3d 1392 (11th Cir. 1995). Further, it is undisputed that plaintiff's transfer did not cause him to miss any meetings of the Liaison Committee.[27] Plaintiff's subjective complaint that he suffered greater stress as a result of the slower pace of work at Station No. 7 is not sufficient to constitute an "adverse" employment decision triggering constitutional scrutiny.

Accordingly, this court has no basis for analyzing whether defendants impermissibly infringed upon rights conferred under the United States Constitution. *See McCabe*, 12 F.3d at 1562. Stated differently, the material facts of this case, viewed in the light most favorable to plaintiff, do not establish "an adverse employment action sufficient to give rise to a cause of action under 42 U.S.C. § 1983." *Smith*, 859 F. Supp. at 1510. Summary judgment therefore is appropriate as to plaintiff's Section 1983

---

[27] Any argument by plaintiff that the loss of his "union steward" position upon transfer constitutes an adverse employment action fails. He admitted in deposition that his services were never utilized by union affiliates at Station No. 5. Additionally, plaintiff has not demonstrated that he was somehow negated from offering his services as a steward to the union affiliates at Station No. 7.

claims.[28]

It is important to distinguish the case at bar, a case focusing on an employee's freedoms of speech and association, from cases involving political patronage. *See Morris v. Crow*, 117 F.3d 449, 455-56 (11th Cir. 1997) ("Nevertheless, we have emphasized that 'it is important to retain the distinction between actions that assert employees' right of expression and actions that challenge discharge decisions based on political patronage.'") (quoting *Terry v. Cook*, 866 F.2d 373, 377 (11th Cir. 1989)). The Supreme Court has held that, upon entering the arena of political patronage, the issue of a particular plaintiff's legal entitlement to promotion, transfer, or recall is "beside the point," at least to the extent of analyzing whether a state actor has denied benefits to a person on a basis that infringes constitutionally-protected interests. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 72, 110 S.Ct. 2729, 2746, 111 L.Ed.2d 52 (1990) (addressing propriety of "hiring freeze" established by Governor of Illinois) (citing *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct.

---

[28] In *McCabe*, plaintiff solely challenged her transfer on First Amendment freedom of association grounds. Nonetheless, the language employed by the Eleventh Circuit is broad, and covers the infringement of all constitutional rights, including those granted by the Fourteenth Amendment.

As additional grounds for dismissal of plaintiff's Fourteenth Amendment claims, this court adopts the arguments advanced by defendants in their brief in support of summary judgment. *See* Doc. No. 21, at 17-21.

2694, 2697, 33 L.Ed.2d 570 (1972)).  The Eleventh Circuit employed the Supreme Court's rationale when holding that a district court erred in dismissing the First Amendment claims of an educational association.  *See Georgia Association of Educators v. Gwinnett County School District*, 856 F.2d 142 (11th Cir. 1988).  In that case, the educational association contended the county board of education "terminated an automatic payroll dues deduction service in retaliation for plaintiffs' exercise of their First Amendment rights."  *Id.* at 143.  The Eleventh Circuit found that dismissal was inappropriate, because there was evidence in the record indicating that such payroll deductions were "valuable benefits" to plaintiffs.  *See id.* at 145 ("Whether the dues deduction service is a valuable benefit to individual plaintiffs turns on the extent to which the absence of the service has caused them expense and inconvenience.").  The factual distinctions between *Georgia Association of Educators* and this case compel this court to follow *McCabe* as controlling Eleventh Circuit precedent on the issue of whether plaintiff has alleged an "adverse" employment action sufficient to state a claim under 42 U.S.C. § 1983.[29]  The "valuable

---

[29] This court is also cognizant of the conclusions reached by a member of this same court in *Cheatwood v. City of Oxford*, 785 F. Supp. 926, 939 (N.D. Ala. 1992) (Propst, J.) (relying on *Rutan* and *Georgia Association of Educators* for proposition that "retaliation may consist in the deprivation of any non-trivial position or privilege because the individual engaged in protected activity," and

benefit" analysis undertaken by the Supreme Court in *Rutan* and the Eleventh Circuit in *Georgia Association of Educators*, focusing upon discriminatory treatment of a group or class of citizens, is not applicable to this case, where a single plaintiff is alleging discrimination based on his expression and association.

**B.   Federal Conspiracy Claim — 42 U.S.C. § 1985(3)**

To the extent that plaintiff's complaint may be construed as alleging a conspiracy in violation of 42 U.S.C. § 1985(3), summary judgment also is appropriate as to that claim.   Section 1985(3) creates a cause of action for the recovery of money damages from persons who conspire to deprive persons of the equal protection of the laws, or other federally-protected rights, privileges, or immunities.[30]   The statute originally was enacted as part of the Ku

---

preserving for trial plaintiffs' first amendment claims premised solely on a lateral transfer).   That decision was reached prior to the Eleventh Circuit's clarification of what constitutes an "adverse" employment action in *McCabe*, however, and this court is bound to follow the Circuit's most recent pronouncement.

[30] 42 U.S.C. § 1985(3) provides, in its entirety:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice

Klux Klan Act of 1871, and "in response to widespread violence and acts of terror directed at blacks and their supporters in the postwar South." *Harrison v. KVAT Food Management, Inc.*, 766 F.2d 155, 157 (4th Cir. 1985) (citation omitted). Section 1985(3) does not provide any "substantial rights itself"; rather, "[t]he rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere ...." *United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049 (1983).

Defendants correctly point out that establishment of a conspiracy under 42 U.S.C. § 1985(3) necessarily requires the plaintiff to show that two or more of the defendants conspired to commit an act that violates federal law.[31] As explained in Section III.A *supra*, however, plaintiff has failed to establish that federal constitutional rights were violated by defendants, because he cannot show that he suffered an "adverse" employment action or

President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

[31] *See* Defendants' memorandum of law in support of summary judgment, at 22.

possessed a protected property interest in his position at City Fire Station No. 5. Plaintiff's federal conspiracy claim necessarily fails as well. *See Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 629 (11th Cir. 1992) (Kravitch, J., dissenting) (noting that Supreme Court precedent "require[s] that there be a class of plaintiffs whose constitutional rights are violated or threatened with violation, and that the action taken by the defendants be motivated against the plaintiffs because of their membership in that class").

## C.  Remaining State Law Claims

Plaintiff's remaining claims are premised on state law. First, plaintiff alleges defendants violated Alabama Code § 11-43-143(b),[32] by discriminating against him based on his affiliation with Local 1437. Second, plaintiff alleges defendants unlawfully conspired to violate that state statute.[33]  Defendants argue plaintiff's claim under Alabama Code § 11-43-143 is due to be

---

[32] *See supra* note 20.

[33] Alabama recognizes civil conspiracy as a substantive tort:

Conspiracy has been defined as the combination of two or more persons to do (a) something that is unlawful, oppressive, or immoral; or (b) something that is not unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means; or (c) something that is unlawful, oppressive, or immoral by unlawful, oppressive, or immoral means.

Charles W. Gamble, *Alabama Law of Damages* § 36-24, at 481 (3d ed. 1994) (footnote omitted).

dismissed, because that statute "does not provide for a private right of action."[34] Defendants cite no authority in support of that argument, and plaintiff offers no authority in rebuttal. Defendants finally contend that plaintiff's state law conspiracy claim necessarily fails, because of plaintiff's inability to state a cause of action under Alabama Code § 11-43-143.

The Eleventh Circuit has held that federal courts should be reluctant to read private rights of action into state statutes, especially where state courts and state legislatures have not done so. *See Swerhun v. Guardian Life Insurance Company of America*, 979 F.2d 195, 198 (11th Cir. 1992) (citations omitted). A review of cases construing § 11-43-143 indicates the statute has been employed in situations factually distinct from the present controversy. *See, e.g., Cremeens v. City of Montgomery*, 54 F. Supp. 2d 1249, 1250 (M.D. Ala. 1999) (fire fighters brought claims under § 1983 and § 11-43-143 against City of Montgomery and Fire Department officials for coercing fire department employees to drop union membership, refusing to promote union members, retaliating against union members, refusing to allow union activities at fire stations, and prohibiting employees from making comments critical of the city); *Enterprise Fire Fighters' Association v. Watson*, 869

---

[34] Defendants' memorandum of law in support of summary judgment, at 21.

F. Supp. 1532, 1535 (M.D. Ala. 1994) (fire fighter challenged termination under § 1983 and § 11-43-143, but the state law claim settled, and was dismissed with prejudice prior to trial).  A review of the statutory and case law associated with Alabama Code § 11-43-143 not only fails to clarify how broadly the anti-discrimination principle enunciated within that statute should be construed, but also does not indicate whether an individual like plaintiff may recover under that statute for what he perceives to be an unlawful lateral transfer.

This court acquired supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).[35]  Subsection (c) of that statute provides that a court may decline to exercise supplemental jurisdiction over state law claims under certain circumstances, such as when "**(1)** the claim raises a novel or complex issue of State law, [or] ... **(3)** the district court has

---

[35] That statute provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).

28

dismissed all claims over which it has original jurisdiction ...."
28 U.S.C. § 1367(c)(1), (3).  Here, this court shall dismiss all
claims over which it possessed original jurisdiction.  "[I]n the
usual case in which all federal-law claims are eliminated before
trial, the balance of factors to be considered under the pendent
jurisdiction doctrine — judicial economy, convenience, fairness,
and comity — will point toward declining to exercise jurisdiction
over the remaining state-law claims."  *Carnegie-Mellon University
v. Cohill*, 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 619 n.7, 98
L.Ed.2d 720 (1988); *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*,
735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal
claims are dismissed prior to trial, [the Supreme Court's decision
in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16
L.Ed.2d 218 (1966)] strongly encourages or even requires dismissal
of state claims").

Further, for the reasons set forth above, this court also
finds that the question of whether Alabama Code § 11-43-143 creates
a private right of action for individuals like plaintiff in the
context of a lateral transfer "raises a novel or complex issue of
State law."  28 U.S.C. § 1367(c)(1); *see also Nolin v. Isbell*, No.
99-10040, 2000 WL 313325, at *5 (11th Cir. Mar. 28, 2000)

(declining to exercise supplemental jurisdiction after dismissal of plaintiff's § 1983 claims, because "[a] proper resolution of the two state law claims will require a careful analysis of Alabama law — something the courts of Alabama are in the best position to undertake").   Accordingly, this court concludes that plaintiff's claim under Alabama Code § 11-43-143 and his state-law conspiracy claim, which is derivative of the state statutory claim, are due to be dismissed without prejudice to plaintiff's right to pursue those claims in the courts of the State of Alabama, if he chooses.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is due to be granted in part and denied in part. Plaintiff's claims premised on federal law are due to be dismissed with prejudice.   Those based on state law are due to be dismissed without prejudice to plaintiff's right to pursue the claims in an appropriate state court.   An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this _10th_ day of May, 2000.

_____
United States District Judge

30